UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

ELIZABETH A. NORTON,               )
                                   )
        Plaintiff,                 )
                                   )
    vs.                            )        Case No. 4:14-CV-263 (CEJ)
                                   )
CAROLYN W. COLVIN, Acting          )
Commissioner of Social Security,   )
                                   )
        Defendant.                 )

## MEMORANDUM AND ORDER

This matter is before the Court for review of an adverse ruling by the Social Security Administration.

## I.  Procedural History

On May 30, 2011, plaintiff Elizabeth Ann Norton filed an application for disability insurance benefits, Title II, 42 U.S.C. §§ 401 *et seq*., with an alleged onset date of December 1, 2005, which was subsequently amended to March 12, 2008. (Tr. 123-25, 126-30, 35). After plaintiff's application was denied on initial consideration (Tr. 68-74), she requested a hearing from an Administrative Law Judge (ALJ). (Tr. 78-79).

Plaintiff and counsel appeared for a hearing on November 15, 2012. (Tr. 33-60). The ALJ issued a decision denying plaintiff's application on December 10, 2012. (Tr. 15-32). The Appeals Council denied plaintiff's request for review on January 9, 2014. (Tr. 1-6). Accordingly, the ALJ's decision stands as the Commissioner's final decision.

## II.  Evidence Before the ALJ

### A.  Disability Application Documents

In her Disability Report (Tr. 169-76), plaintiff listed her disabling conditions as major depressive disorder and bipolar 2 disorder. She had previously worked as a

college instructor and a legislative liaison. She was prescribed psychotropic medications Bupropion XL,[1] Lamotrigine,[2] Ritalin, Trazodone,[3] and Venlafaxine.[4] In addition to medication, she received therapy and electroconvulsive treatment (ECT).[5]

Plaintiff completed a Function Report on June 15, 2011. (Tr. 177-87). She lived alone. Her daily activities included making coffee, letting the dogs out, watching television, using the laptop for email and browsing, eating, and sleeping for two or three hours. She occasionally tried to exercise and she reported that she did laundry, managed her checkbook, and cleaned house. She was in contact with her therapist five days a week. She occasionally saw a doctor, saw a movie, or visited her sister. Her sister brought pet food and helped her with trips to the vet or groomer.

Plaintiff stated that since becoming ill she was unable to walk her dogs, get places on time, drive long distances, or shop. She had difficulty sleeping. With respect to self-care, she reported having difficulty choosing appropriate clothing and her bathing and grooming habits were lacking. She needed reminders to comb and cut

---

[1]Buproprion is an antidepressant of the aminoketone class and is indicated for treatment of major depressive disorder. See Phys. Desk Ref. 1648-49 (63rd ed. 2009).

[2]Lamictal, or Lamotrigene, is used to increase the time between episodes of depression, mania, and other abnormal moods in patients with bipolar disorder. www.nlm.nih.gov/medlineplus/druginfo/meds (last visited on December 17, 2014).

[3]Trazodone is a seratonin modulator prescribed for the treatment of depression. It may also be prescribed for the treatment of schizophrenia and anxiety. www.nlm.nih.gov/medlineplus/druginfo/meds (last visited on Oct. 27, 2009).

[4]Effexor, or Venlafaxine, is indicated for the treatment of major depressive disorder. See Phys. Desk Ref. 3196 (63rd ed. 2009).

[5]During electroconvulsive therapy (ECT), electric currents are passed through the brain, intentionally triggering a brief seizure. ECT seems to cause changes in brain chemistry that can quickly reverse symptoms of certain mental illnesses, including severe or treatment-resistant depression. http://www.mayoclinic.org/tests-procedures /electroconvulsive-therapy/basics/definition/prc-20014161 (last visited Dec. 17, 2014).

her hair.  Plaintiff prepared very simple meals, such as cereal or sandwiches.  She reported that her diet consisted of starches, soda, and water.  With respect to household chores, she stated that she spent 15 or 20 minutes a day doing laundry, sweeping, dusting and cleaning bathrooms.  Her sister cleaned the house and did laundry for her every two months.  She could occasionally go out alone, but stated that she was too anxious, scared or unfocused.  She did shopping in stores, by mail or online.  Her sister helped her pay bills, but she could handle her bank accounts and count change.  Her hobbies included watching television, listening to music, and making graphics for her sister.  She tried to go to a movie with a friend once a week, but she had to talk herself into it.  Plaintiff had difficulties with memory, completing tasks, concentrating, understanding, following instructions, and using her hands.  She explained that it was "almost impossible" for her to complete tasks; she had to read things three or four times to understand them; often could not remember what she or others had said; her concentration was "erratic;" and it took her longer to do things on the computer.  Although she thought she could pay attention for about 10 or 15 minutes, she had to read the application forms a dozen or more times to understand what she was supposed to do.  She could manage short verbal instructions.  She handled changes in routine poorly.  She was able to be respectful to authority figures even when irritated by them.  She was afraid to walk alone or with her dog; was unhappy being away from home for more than a couple of hours; and had trouble with unspecified sounds. She had difficulty falling and staying asleep.

Plaintiff's sister, Nancy Norton, completed a Third-Party Function Report on June 17, 2011.  (Tr. 188-95).  Ms. Norton stated that she spent at least 15 hours a week with plaintiff.  She stated that plaintiff had increased her seclusion and described her

daily activities as follows: "Sits in house and smokes and watches TV, takes care of dogs, goes to movie with neighbor, obsessed with computer, attends some family dinners, goes to Goodwill [and] Walgreens." Ms. Norton took the dogs to her own house when they became too much for plaintiff. Plaintiff might stay up all night because she was feeling stressed by a simple thing. Ms. Norton made appointments for and drove plaintiff to the dentist and eye doctor. Plaintiff's diet was restricted, and she no longer even heated soup in the microwave. Ms. Norton thought that plaintiff's medications affected her sense of taste. Plaintiff's lack of concentration interfered with her ability to get things done; she barely cleaned her house, and might store up her laundry and then spend all night doing it. Plaintiff, who "used to be a great driver," hit things in the road or the garage. She forgot to pay bills or failed to do so if she had no money. Plaintiff went to a movie once a week and out to dinner once or twice a week. She used to be able to grocery shop, go to music events, drive more than 5 miles, make simple decisions, cook, and enjoy life.

## B. <u>Testimony at Hearing</u>

Plaintiff was 54 years old at the time of the hearing on November 15, 2012. She graduated from college and obtained a Master's degree. She last worked in 2005 as a part-time instructor for a single semester at a college. She testified that she "muddled through" the semester, explaining that it was a struggle for her to manage the students and that she had trouble organizing and staying focused. (Tr. 38). For example, she was shown how to use the classroom technology but could not remember how to do so. She could manage about thirty minutes of lecturing before she broke the students into groups. She described herself as rather uncomfortable and lacking in energy. She was tired from the "whole ordeal" of preparing for class and driving to

the school and she wanted to leave as quickly as possible. Before teaching, she worked for one year as a legislative liaison for the Illinois Environmental Protection Agency. (Tr. 39-40). The job required her to handle phone calls and correspondence from state legislators regarding constituent concerns. She testified that she could not "take the hours," and missed her sisters' support. It became "harder and harder" to contain her emotions and maintain a professional demeanor.

Plaintiff testified that, in 2008, she was suffering from intractable depression and had a nervous breakdown. Her depression did not respond to medication and she was not functioning "at all." (Tr. 40-41). She was suicidal but lacked the energy to act on the feelings; she also had a strong wish not to do something that would harm others. She was hospitalized three times in 2008. The third hospitalization came about after her sixth or seventh ECT. The staff thought she might be suicidal and admitted her "without even [her] participation in the decision." (Tr. 41). In August or September 2008, plaintiff's psychiatric care was transferred to Katherine P. Buchowski, M.D.[6] Sun Smith-Forte has provided therapy to plaintiff for about 12 years, seeing her three times a week or more. (Tr. 43). In 2008, plaintiff was "probably talking to her four or five times a week."

Plaintiff testified that, following her release from the hospital in 2008, she was unable to take care of herself. One of her sisters moved in with her to take care of meals, the house, and plaintiff's dog. She slept quite a bit and had a great deal of trouble getting up and staying up; it was also a struggle for her to shower and dress. Eventually, her sister made her leave the house to run an errand with her, a trip that plaintiff described as "taxing." (Tr. 44).

---

[6]Plaintiff was treated by Adam Sky, M.D., between 2000 and 2008. See Tr.230.

In response to questions from the ALJ, plaintiff acknowledged that she had been to Texas once between 2008 and 2010; she could not recall whether she had been to California. She also acknowledged that she told her psychiatrist that she was self-employed as an artist. (Tr. 45). However, she did not earn any money as an artist. The records reflect that she claimed to have been commissioned to do a painting. (Tr. 46). She testified that it was more accurate to say that she was asked to do a painting; there was no commitment of money and she never finished it. She also added text to photographs for a friend, but she required a lot of help to finish the project. The ALJ pressed plaintiff, noting that in 2009 she had told her psychiatrist that she was getting commissions to do artwork. (Tr. 47). Plaintiff stated that she found it hard to acknowledge that, despite advantages and opportunities, she was not accomplishing anything. When people asked her to work on projects, she had great hopes but, over time, she had a better grasp of her limits. The last time she produced significant work was in 2003. (Tr. 53). When challenged that she had been dishonest with her psychiatrist, plaintiff testified that she was trying to convince herself that she was functioning. (Tr. 47-48). She did not want her psychiatrist to think she was "giving in to [her] limitations" and she "was not raised to look like [she] was having a hard time and so [was] pretty good at it." (Tr. 50-51).

The ALJ asked plaintiff if she had been "going to parties," citing a notation in July 2008. Plaintiff vaguely recalled that she had attended a party. She also stated that she had a birthday party that her sisters had arranged for her. (Tr. 48). Plaintiff attended yoga three times a week for seven or eight months, but stopped because she became self-conscious, it was hard to focus, and she was "so tired." (Tr. 49).

Plaintiff did not think she would have been able to work between 2008 and 2010 because she had difficulty staying focused and keeping her emotions under control. Earlier in her career she had panic attacks and crying spells while teaching. In 2008, she had required her sister's assistance in managing her home, preparing meals, and doing laundry. She still found it difficult to pay bills, because she needed reminders and then found it hard to focus sufficiently to write a check. She had difficulty reading, and she got lost when driving. She had applied to a local art store for a job, and brought home a job application from Goodwill but never completed it.

The ALJ asked Robin A. Cook, Ph.D., a vocational expert, to classify plaintiff's past work in accordance with the <u>Dictionary of Occupational Titles</u> and <u>Selected Characteristics of Occupation</u>. (Tr. 54). Dr. Cook testified that because plaintiff did not work at her past positions for one year of full-time work, she did not meet any Specific Vocational Preparation (SVP) levels. (Tr. 54-55). Dr. Cook also testified that an individual with plaintiff's education who was limited to performing unskilled work with no more than infrequent handling of customer complaints would be unable to perform plaintiff's past relevant work, but could work as an industrial cleaner, kitchen helper, or housekeeping cleaner. (Tr. 55-56). Plaintiff's counsel asked Dr. Cook to assume that the individual had marked limitations in the ability to maintain attention, concentration, and focus on work duties, and the ability to sustain employment for more than 6 months without decompensation. Dr. Cook was asked to further assume that the individual had moderate limitations in several abilities, including the ability to maintain a schedule and be punctual; to understand, remember and carry out simple instructions and procedures; to complete a normal workweek without interruption from psychological symptoms; to maintain appropriate behavior in interaction with others

and respond appropriately to criticism, changes in routine, and stress; and to demonstrate reliability.[7]  Such a person would not be able to work.  (Tr. 58).

## C.  Medical Records

On March 12, 2008, plaintiff was admitted to St. Mary's Health Center with complaints of depression, which began in September 2007.  (Tr. 238-40).  She reported that she had crying spells, impaired concentration, loss of interest and energy, and social withdrawal.  She had poor appetite and had lost 5 to 10 pounds over the prior two months.  She agreed to hospitalization when she began to have suicidal thoughts.  She had been hospitalized 25 years earlier when she was working on her Master's degree.  During that hospitalization, she was diagnosed with bipolar disorder and started taking Lithium.  She had other periods of depression but this episode was the most severe that she had experienced.  She has also been treated with Lamictal, Abilify,[8] Trazadone, and Effexor. Plaintiff reported that she had spent two years teaching high school and then taught at Hofstra College for 10 years.  Since that time, she worked only part-time, if at all, and was living on inherited money.  She appeared depressed and somewhat forlorn.  She was cooperative and well oriented.  Her diagnosis at admission was bipolar, depressed, and she was assigned a Global Assessment of Functioning score of 30.  Plaintiff was discharged on March 19, 2008,

---

[7]These are the limitations found in the medical source statement completed by plaintiff's treating psychiatrist in August 2011. (Tr. 286).  The ALJ objected to the submission of this evidence to Dr. Cook because "there is no indication whether Ms. [sic] Buchowski is referring to the plaintiff's present condition orwhether she has referred back to 2008 to 2010."  (Tr. 58).

[8]Abilify, or Aripiprazole, is used to treat episodes of mania or mixed episodes in persons with bipolar disorder, and depression when symptoms cannot be controlled by the antidepressant alone. www.nlm.nih.gov/medlineplus/druginfo/meds (last visited on Dec. 17, 2014).

after she denied suicidal ideation and declined ECT.  Her sister agreed that plaintiff could stay with her after discharge and her treating psychiatrist, Dr. Adam Sky, agreed to discharge plaintiff with instructions to follow up with him in two days.  (Tr. 236-37).

Plaintiff was readmitted to St. Mary's Health Center on May 30, 2008, following her seventh ECT.  (Tr. 229-32).  Dr. Sky noted that plaintiff had increasing tearfulness, anxiety and depression.  She stated that she "can't take it anymore" and it was felt that she needed additional treatment and observation.  (Tr. 230-31).  She reported feeling hopeless and very disappointed in herself for ending up in the hospital.  Dr. Sky noted that the ECT treatments had produced marginal results, although her sister had seen some improvement.  Her current medications included Venlafaxine, Bupropion, and Trazadone.  She had been treated in the past with Fluoxetine,[9] Lithium, and Depakote.[10]  The plan was to continue her medications and ECT.  Dr. Sky said he would also talk with plaintiff's sister, whom he viewed as "a pretty good barometer" as to how plaintiff was doing.  On June 1st, Dr. Sky noted that plaintiff was totally focused on going home; her mood was fair and her affect was depressed.   (Tr. 232).  She was discharged on June 2nd after her eighth ECT.  Further ECT was suspended because her family insisted that she was doing much better.  (Tr. 229).

Psychiatrist Katherine P. Buchowski, M.D., completed a new patient evaluation on July 8, 2008.   (Tr. 264-67).   Plaintiff reported that she did not have much enthusiasm, had no motivation, and did not look forward to anything better.  She slept for five or six hours and described her energy as low.  She reported that she had

---

[9]Prozac, or fluoxetine, is a psychotropic drug indicated for treatment of, *inter alia*, major depressive disorder.  See Phys. Desk. Ref. 1772-72 (60th ed. 2006).

[10]Depakote, or Valproic acid, is also used to treat mania in people with bipolar disorder. www.nlm.nih.gov/medlineplus/druginfo/meds (last visited on Oct. 27, 2009).

chronic low motivation and sadness. Dr. Buchowski noted that plaintiff was alert and cooperative, with no abnormality of speech or thought. She presented with depressed mood, full range of affect, and good concentration. Dr. Buchowski diagnosed plaintiff with Major Depressive Disorder - Recurrent, Moderate, rule out Dysthymia. She assessed plaintiff's current GAF as 50, and her highest in the past year as 60. Dr. Buchowski made changes to plaintiff's medications, including discontinuing Zyprexa.

On July 22, 2008, Dr. Buchowski noted that plaintiff was "really struggling," with crying spells and some anxiety. She was seeing or speaking with her therapist daily. Dr. Buchowski assessed her mood as depressed and her affect as constricted. She represcribed Zyprexa. (Tr. 263). The following week, plaintiff noted some improvement, describing herself as "less teary" with slightly increased motivation, and slightly decreased anxiety. She went to a party. She was also planning to go to California in August to see her sister, but was unsure whether she wanted to go. She was trying to de-clutter her house. (Tr. 262).

In August, plaintiff reported that she had enjoyed her trip to California and was considering a volunteer job. She rated her motivation level at "50%". She was not taking her Trazadone. (Tr. 261). In September 2008, plaintiff reported that her mood and motivation had both declined. She was spending time online looking for jobs and reading. Dr. Buchowski noted that plaintiff had depressed mood and constricted affect and introduced a trial of Ritalin to treat refractory depression. (Tr. 260). In October 2009, plaintiff reported mild improvement to energy and motivation and that she had sent out some resumes. Her energy and motivation were mildly improved with Ritalin. She was assessed as depressed, with constricted affect and Dr. Buchowski prescribed Lamictal. (Tr. 259). The following month, plaintiff reported that her mood and

motivation were better. She was mildly anxious because she needed to prepare her home for a visit from her sister. Dr. Buchowski noted that plaintiff was busy socializing and had improved mood. She had mild bilateral tremulousness. (Tr. 258). In November 2008, plaintiff reported that she had enjoyed her sister's visit and was socializing with friends. She described her mood as "ok" and said she had good motivation in the morning. (Tr. 257).

In January 2009, plaintiff reported that she had been "ok" during the holidays, but was feeling let-down since. She had occasional anxiety, but less difficulty leaving her house. She was receiving individual therapy 2 to 3 times a week. In February, she said her mood was low, she was having more difficulty sleeping through the night, and was more tired as a result. Her motivation was low as well. She was enjoying yoga twice a week. (Tr. 255). In March, she stated that she was struggling "a little," but learning to meditate and enjoying yoga. Her motivation was poor and parts of her house were untidy. She was waking up between 4:00 and 5:00 in the morning. (Tr. 254). In April, she was active with friends, meditating with friends three times a week, and had started using Facebook. She was planning to visit friends in Texas in June. Her depression was "still there," but her sleep, appetite and energy were all "ok." (Tr. 253). In June, she was irritable, tired, and edgy. Her 50th birthday was hard because friends threw a surprise party for her; her trip to Texas was also hard. She "calmed" considerably during the appointment. (Tr. 252). In August, she reported that she was "just muddling through." She was having trouble getting out, was no longer doing yoga, and was talking to her therapist on the telephone three times a week. She was still going out for coffee and a movie. Dr. Buchowski assessed her as "stable." (Tr. 251). She was again "stable" in October. (Tr. 250). In December, she reported that

she was "doing ok" and was very busy and working on her first art project. She also complained about confusion and forgetfulness. (Tr. 249).

Dr. Buchowski assessed plaintiff as stable throughout 2010. In February, plaintiff reported that she had finished a painting for her nephew and had been commissioned to do another painting. She also did some artwork for a CD. She was very distracted and forgetful, and had difficulty staying on task. In April, she was going out regularly, and it was taking less effort than it had a year earlier. She was painting "a little" and her house was in good shape. (Tr. 247). In June, she mentioned that her sister was staying with her. She continued to be socially active, but leaving the house was very hard. She was painting but the results were disappointing. (Tr. 246). In September, she visited a friend in Connecticut. She had anxiety before leaving. (Tr. 245). In November, plaintiff reported that she was doing well and looking forward to the holidays. She was socializing with friends. Dr. Buchowski described plaintiff as "doing very well."[11]

On July 1, 2011, Sun Smith-Foret, LCSW, completed a medical source statement (MSS). (Tr. 271-72). She diagnosed plaintiff with Major Depressive Disorder with melancholic features. She noted that plaintiff had been withdrawn, fearful, and anxious in childhood and had been hospitalized in the past. She described plaintiff as "maintaining" with medication and psychotherapy. On a daily basis, plaintiff presented with intermittently depressed mood; fatigue and loss of energy; diminished sensation of pleasures; feelings of worthlessness; diminished ability to think or concentrate; and

---

[11]Dr. Buchowski saw plaintiff six times in 2011 and twelve times in 2012. (Tr. 243, 242, 289-92, 305, 288, 297-304). Although plaintiff was generally stable, Dr. Buchowski noted difficulty with focus, constricted affect, poor eye contact, and irritability. In 2012, Dr. Bukowski noted restlessness more frequently.

recurrent thoughts of death. She had psychotherapy three times a week plus medication. Her GAF at her last hospitalization had been 20 and was 50 at the present time. Ms. Smith-Foret wrote that plaintiff "has very strong work ethic. Depressive condition makes even volunteer work impossible. She is no longer actively suicidal but requires meds and psychotherapy to sustain life skills and relationships." (Tr. 271).

Ms. Smith-Foret also completed a Mental Residual Functional Capacity Assessment. (Tr. 272). She assessed plaintiff as having marked limitations[12] in the abilities to maintain a work schedule and be punctual; maintain adequate attention, concentration, and focus throughout a work day; complete a normal work week without interruptions from symptoms; interact appropriately with customers or the public and work in coordination with or close proximity to others; respond to work changes and stressors; demonstrate reliability; and work for more than six months without decompensation. Ms. Smith-Foret assessed plaintiff as having moderate limitations[13] in the abilities to understand, remember, and carry out instructions; accept instruction and criticism; maintain socially appropriate behaviors and adhere to basic standards of cleanliness and neatness; and maintain personal appearance and hygiene.

Martin Isenberg, Ph.D. completed a Psychiatric Review Technique on July 27, 2011. (Tr. 273-83). Based on a review of the record, Dr. Isenberg concluded that plaintiff met the criteria for affective disorder, but that her impairment was not severe.

---

[12]"Marked" is defined as "a complete inability to perform the particular activity in a normal work setting, even for short periods of time."

[13]"Moderate" indicates that "the activity is not totally precluded but is significantly impaired in terms of proficiency and/or the ability to sustain the particular activity over the course of a work day/week." The term indicates that "the activity can be performed occasionally but not continually, in a normal work setting."

Dr. Isenberg found that plaintiff was mildly restricted in the activities of daily living but otherwise had no limitations. Dr. Isenberg noted that plaintiff has been seeking psychiatric treatment for major depressive disorder and dysthymia since July 2008. She had several medication adjustments during the first year but has been stable since July 2009. In November 2010, she was looking forward to holiday events; in February 2011, she reported that "everything was pretty good." She was active with friends, her mental status was normal, and she was stable. Dr. Isenberg found that plaintiff did not have a medically determinable impairment of bipolar disorder. Although she has had severe impairments in the past, she was currently stable and her symptoms were nonsevere on December 31, 2010, the date she was last insured.

Dr. Buchowski completed an MSS on August 8, 2011. (Tr. 285). She noted that plaintiff's psychiatric history began in her late teens and that she has been in psychiatric care for over 25 years. She was diagnosed with recurrent Major Depressive Disorder with predominant symptoms of low mood, crying spells, lack of motivation, heightened anxiety, and inability to focus. Her episodes of depression could last for six months. In between these episodes, she had dysthymia, which Dr. Buchowski defined as chronic low mood. She was hospitalized three times, underwent ECT, and was prescribed psychotropic medications. Dr. Buchowski described plaintiff's current functioning as "barely stable. She is able to manage the anxiety and depression but is easily overcome by mild stress. She continues to have difficulty with focus/concentration and initiative." Her diagnoses were Major Depressive Disorder - Recurrent, and Dysthymia. Her GAF was 50. Therapy and medication kept her "barely stable." Her medications were Velafaxone (a total of 225 mg a day); Lamictal (150 mg a day); Budeprion XL (300 mg a day); Ritalin (a total of 10 mg a day); and

Trazodone (100 mg a day). Dr. Buchowski opined that plaintiff "has been barely stable for a couple of years now. When placed under even minimal stress, she decompensates." Full-time employment "would almost certainly lead to a recurrence" of Major Depressive Disorder.

Dr. Buchowski also completed a Mental Residual Functional Capacity Assessment. (Tr. 286). She assessed plaintiff as having marked limitations in the abilities to maintain adequate attention, concentration, and focus throughout a work day, and to work for more than six months without decompensation. She assessed plaintiff as having moderate limitations in the abilities to maintain a work schedule and be punctual; to understand, remember, and carry out instructions; make simple work-related decisions; complete a normal work week without interruptions from symptoms; interact appropriately with customers or the public and work in coordination with or close proximity to others; accept instruction and criticism; maintain socially appropriate behaviors and adhere to basic standards of cleanliness and neatness; respond to work changes and stressors; demonstrate reliability; and maintain personal appearance and hygiene.

On February 12, 2012, Ms. Smith-Foret provided an additional statement, to more specifically address plaintiff's condition before December 31, 2010. (Tr. 295-96). She reiterated that plaintiff was hospitalized in 2008 for a severe depressive episode and was treated with ECT, in addition to ongoing treatment with medication and supportive therapy. Her GAF had maintained at 45 for the last four years. Plaintiff's condition "is long standing, . . . pervasive, chronic, and severe." With psychotherapy, she was able to maintain her sense of self, and engage in necessary grooming and social interactions, exclusive of working. Ms. Smith-Foret diagnosed plaintiff with an

Axis II disorder of dependent personality disorder and deferred to Dr. Buchowski's Axis I diagnosis.

Dr. Buchowski also provided an additional statement. She answered "Yes," to the question whether plaintiff's impairments would prevent her from working "back to at least March 2008." (Tr. 307). Dr. Buchowski stated that plaintiff was stable in a chronic depressed and anxious state. "Full-time employment would almost certainly cause deterioration of her mood into a <u>very</u> deeply depressed and anxious state." (emphasis in original).

### III.  The ALJ's Decision

In the decision issued on December 10, 2012, the ALJ made the following findings:

1.  Plaintiff met the insured status requirements of the Social Security Act through December 31, 2010.

2.  Plaintiff has not engaged in substantial gainful activity between March 12, 2008, her alleged onset date, and December 31, 2010.

3.  Through December 31, 2010, plaintiff had the following severe impairment: recurrent major depression.

4.  Through December 31, 2010, plaintiff did not have an impairment or combination of impairments that meet or medically equal the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

5.  Through December 31, 2010, plaintiff had the residual functional capacity to perform work at all exertional levels with the following nonexertional limitations:  She can at least understand, remember, and carry out simple instructions, and nondetailed tasks (or unskilled work), and she should not perform work that requires more than infrequent handling of customer complaints.

6.  Through December 31, 2010, plaintiff was not capable of performing her past relevant work.

7.  Plaintiff was born on June 1, 1959, and was 51 years old, which is defined as a younger individual age 18-49, on December 31, 2010.[14]

8.  Plaintiff has a Master of Arts degree with additional doctorate-level classes and is able to communicate in English.

9.  Transferability of job skills os not material to the determination because using the Medical-Vocational Rules as a framework supports a finding that plaintiff is not disabled, whether or not she has transferrable skills.

10. Through December 31, 2010, considering plaintiff's age, education, work experience, and RFC, there were jobs that existed in significant numbers in the national economy that plaintiff could have performed, such as industrial cleaner, kitchen helper, or housekeeper or cleaner.

11. Plaintiff was not under a disability within the meaning of the Social Security Act from March 12, 2008, through December 31, 2010.

(Tr. 18-28).

## IV.  **Legal Standards**

The Court must affirm the Commissioner's decision "if the decision is not based on legal error and if there is substantial evidence in the record as a whole to support the conclusion that the claimant was not disabled." Long v. Chater, 108 F.3d 185, 187 (8th Cir. 1997).  "Substantial evidence is less than a preponderance, but enough so that a reasonable mind might find it adequate to support the conclusion." Estes v. Barnhart, 275 F.3d 722, 724 (8th Cir. 2002) (quoting Johnson v. Apfel, 240 F.3d 1145, 1147 (8th Cir. 2001)).  If, after reviewing the record, the Court finds it possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the Court must affirm the decision of the

---

[14]At age 51, plaintiff was actually classified as a person "closely approaching advanced age," not a "younger person."  20 C.F.R. § 404.1563(d).  While the age of a younger person is not generally considered to be a factor in determining a claimant's ability to work, § 404.1563(c), for a person closely approaching advanced age, the Social Security Administration "will consider that your age along with a severe impairment(s) and limited work experience may seriously affect your ability to adjust to other work."

Commissioner.  Buckner v. Astrue, 646 F.3d 549, 556 (8th Cir. 2011) (quotations and citation omitted).

To be entitled to disability benefits, a claimant must prove she is unable to perform any substantial gainful activity due to a medically determinable physical or mental impairment that would either result in death or which has lasted or could be expected to last for at least twelve continuous months.  42 U.S.C. § 423(a)(1)(D), (d)(1)(A); Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009).  The Commissioner has established a five-step process for determining whether a person is disabled.  See 20 C.F.R. § 404.1520; Moore v. Astrue, 572 F.3d 520, 523 (8th Cir. 2009).  "Each step in the disability determination entails a separate analysis and legal standard."  Lacroix v. Barnhart, 465 F.3d 881, 888 n.3 (8th Cir. 2006).

Steps one through three require the claimant to prove (1) she is not currently engaged in substantial gainful activity, (2) she suffers from a severe impairment, and (3) her disability meets or equals a listed impairment.  Pate-Fires, 564 F.3d at 942. If the claimant does not suffer from a listed impairment or its equivalent, the Commissioner's analysis proceeds to steps four and five.  Id.

"Prior to step four, the ALJ must assess the claimant's residual functioning capacity ('RFC'), which is the most a claimant can do despite her limitations."  Moore, 572 F.3d at 523 (citing 20 C.F.R. § 404.1545(a)(1)).  "RFC is an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect his or her capacity to do work-related physical and mental activities."  Social Security Ruling (SSR) 96-8p, 1996 WL 374184, *2. "[A] claimant's RFC [is] based on all relevant evidence, including the medical

records, observations by treating physicians and others, and an individual's own description of his limitations." Moore, 572 F.3d at 523 (quotation and citation omitted).

In determining a claimant's RFC, the ALJ must evaluate the claimant's credibility. Wagner v. Astrue, 499 F.3d 842, 851 (8th Cir. 2007); Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2002). This evaluation requires that the ALJ consider "(1) the claimant's daily activities; (2) the duration, intensity, and frequency of the pain; (3) the precipitating and aggravating factors; (4) the dosage, effectiveness, and side effects of medication; (5) any functional restrictions; (6) the claimant's work history; and (7) the absence of objective medical evidence to support the claimant's complaints." Buckner v. Astrue, 646 F.3d 549, 558 (8th Cir. 2011) (quotation and citation omitted). "Although 'an ALJ may not discount a claimant's allegations of disabling pain solely because the objective medical evidence does not fully support them,' the ALJ may find that these allegations are not credible 'if there are inconsistencies in the evidence as a whole.'" Id. (quoting Goff v. Barnhart, 421 F.3d 785, 792 (8th Cir. 2005)). After considering the seven factors, the ALJ must make express credibility determinations and set forth the inconsistencies in the record which caused the ALJ to reject the claimant's complaints. Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000); Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998).

At step four, the ALJ determines whether a claimant can return to her past relevant work, "review[ing] [the claimant's] [RFC] and the physical and mental demands of the work [claimant has] done in the past." 20 C.F.R. § 404.1520(e). The burden at step four remains with the claimant to prove her RFC and establish that she cannot return to her past relevant work. Moore, 572 F.3d at 523; accord Dukes v.

Barnhart, 436 F.3d 923, 928 (8th Cir. 2006); Vandenboom v. Barnhart, 421 F.3d 745, 750 (8th Cir. 2005).

If the ALJ holds at step four of the process that a claimant cannot return to past relevant work, the burden shifts at step five to the Commissioner to establish that the claimant maintains the RFC to perform a significant number of jobs within the national economy.  Banks v. Massanari, 258 F.3d 820, 824 (8th Cir. 2001).  See also 20 C.F.R. § 404.1520(f).

If the claimant is prevented by her impairment from doing any other work, the ALJ will find the claimant to be disabled.

### V.  Discussion

Plaintiff argues that (1) the ALJ improperly evaluated the opinion of her treating physician, Dr. Buchowski, and (2) improperly assessed plaintiff's residual functional capacity (RFC).

### A.  Dr. Buchowski's Opinion

As set forth above, Dr. Buchowski opined that plaintiff had significant limitations in work-related abilities which the vocational expert testified precluded from employment.  The ALJ gave her opinion "little weight." (Tr. 25).

Dr. Buchowski is a treating physician and thus her opinion is entitled to controlling weight if it "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [a claimant's] case record." Tilley v. Astrue, 580 F.3d 675, 679 (8th Cir. 2009) (quoting 20 C.F.R. § 404.1527(d)(2)). While a treating physician's opinion is normally entitled to great weight, such an opinion does not automatically control, because the record must be evaluated as a whole.  Prosch v. Apfel, 201 F.3d 1010, 1013 (8th Cir. 2000)

(internal quotations and citations omitted).  Furthermore, "treating source opinions on issues that are reserved to the Commissioner are never entitled to controlling weight." Soc. Sec. Ruling 96–5p, 1996 WL 374183, at *2 (July 2, 1996).  Whether the ALJ grants a treating physician's opinion substantial or little weight, the regulations provide that the ALJ must "always give good reasons" for the particular weight given to a treating physician's evaluation.  Prosch, 201 F.3d at 1013 (quoting 20 C.F.R § 404.1527(d)(2)).

The ALJ gave little weight to Dr. Buchowski's opinion because her medical source statement completed in August 2011 "clearly states it is based on the claimant's current condition."   See also Def. Brief at 7 [Doc. #13] (Dr. Buchowski's opinion specifically related to plaintiff's "present" symptomology, "current" diagnoses, and "current" medications, which were outside the relevant time period). (Tr. 25).  This is a cramped reading of the MSS, which clearly states that (1) plaintiff has a long and complex psychiatric history; (2) she has been in psychiatric care for over the last 25 years; (3) she has been hospitalized three times for her mood disorder;[15] (4) she "has been barely stable for a couple of years now."  As evidence that the 2011 MSS was limited to plaintiff's functioning in 2011, the ALJ cited Dr. Buchowski's treatment notes, which showed "visits of increasing frequency beginning in August 2011, and clinical signs of worsening depression consistent with [the] medical source statement of late 2011." (Tr. 26).  However, any ambiguity as to Dr. Buchowski's meaning was cleared

---

[15]The record establishes that plaintiff was hospitalized once more than 20 years ago when she was in graduate school, and twice more in 2008.  For the purposes of the Paragraph B criteria of Listing 12.04, the ALJ determined that plaintiff's hospitalizations in 2008 constituted a single episode of decompensation of extended duration, rather than multiple episodes.  (Tr. 21).  Plaintiff does not challenge this determination.

up by her November 2012 statement that plaintiff's conditions had been present since at least March 2008.[16]  It was error for the ALJ to substitute her opinion for that of the treating physician.  See Ness v. Sullivan, 904 F.2d 432, 435 (8th Cir. 1990) (ALJ erred in substituting his opinion that plaintiff did not seem depressed at hearing for doctor's assessment of plaintiff's mental health); see also Pate-Fires v. Astrue, 564 F.3d 935, 946-47 (8th Cir. 2009) (ALJs may not "play doctor"); Rohan v. Chater, 98 F.3d 966, 970 (7th Cir. 1996) ("ALJs must not succumb to the temptation to play doctor and make their own independent medical findings.").

Defendant's assertion that the August 2011 MSS listed only "current" medications is disingenuous: plaintiff took psychotropic medications throughout the relevant time period.  Furthermore, the regimen reflected in the August 2011 MSS was in place on March 9, 2009, within the relevant period.  (Tr. 254).  Similarly, Dr. Buchowski's diagnosis of plaintiff remained constant throughout the relevant period up to and including the August 2011 MSS.

The ALJ found that Dr. Buchowski's statements were inconsistent with her treatment notes, which reflected fairly normal mental status evaluations.  However, Dr. Buchowski's notes also record plaintiff's ongoing anxiety about leaving the house, poor motivation, poor focus, and sleep issues.  These observations are consistent with Dr. Buchowski's opinion that plaintiff would struggle with completing a normal work week without interruption from her symptoms, or sustaining employment for longer than 6

---

[16]The ALJ rejected Dr. Buchowski's 2012 statement, apparently since it was solicited by counsel.  (Tr. 25) (giving little weight to statement "which was prepared by [counsel] after I ruled the Vocational Expert could not testify about the residual functional capacity as it was not made in reference to claimant's condition prior to her date last insured.")  The ALJ cannot have it both ways by first asserting that there is an ambiguity with respect to the physician's statement and then rejecting the physician's clarification when it is offered.

months without decompensation.  See Reed v. Barnhart, 399 F.3d 917, 922 (8th Cir. 2005) (rejecting ALJ's determination treating psychiatrist's treatment notes did not support conclusions on MSS).   The ALJ determined that the treatment notes "demonstrate a clear progression and improvement aside from complaints about memory details and recall." (Tr. 25).   However, "[i]t is possible for a person's health to improve, and for the person to remain too disabled to work." Cox v. Barnhart, 345 F.3d 606, 609 (8th Cir. 2003).  Plaintiff's improved mood while taking five psychotropic medications and receiving supportive therapy is not evidence that she can function in a competitive work environment.

Dr. Buchowski's opinion is also consistent with other medical evidence in the record.  Dr. Adam Sky provided psychiatric treatment to plaintiff between 2000 and 2008.  (Tr. 230).  In March 2008, despite treatment with Velafaxine, Bupropion, and Trazodone, plaintiff's depression deteriorated to the extent that she required inpatient hospitalization.   She thereafter underwent ECT treatments that produced "marginal results." (Tr. 230).  In June 2008, Dr. Sky described plaintiff as doing poorly and she was admitted to the hospital for a second time. (Tr. 232).  At discharge, her mood was "a little better," and she was discharged to stay with her sister Nancy, rather than going home alone.  (Tr. 236).  Dr. Isenberg noted that between July 2008 and July 2009, plaintiff required several changes to her psychotropic  medications in order to achieve stability.[17]   Finally, plaintiff saw or talked by telephone with her therapist Ms. Smith-Foret multiple times a week.

---

[17]The ALJ gave slight weight to Dr. Isenberg's conclusions but noted that he summarized the records correctly.  (Tr. 26).

Dr. Buchowski's MSS is also consistent with those provided by Ms. Smith-Foret. Although not an "acceptable medical source," as defined in the Social Security regulations, Ms. Smith-Foret's observations "may . . . provide insight into the severity of the impairment(s) and how it affects the individual's ability to function." Sloan v. Astrue, 499 F.3d 883, 888 (8th Cir. 2007) (discussing SSR 06-03p). Dr. Buchowski and Ms. Smith-Foret agree that plaintiff's condition severely impairs her ability to function, differing only with respect to the magnitude of that impairment.[18] Finally, Dr. Buchowski's MSS is fully supported by the statement provided by plaintiff's sister, who spent 15 hours a week with her, drove her to appointments, cleaned her house and did her grocery shopping. Ms. Norton observed that plaintiff was no longer able to concentrate enough to read, was increasingly secluded, and could stay up all night when stressed by "a simple thing." (Tr. 189).

The court finds that the ALJ did not give proper reasons for assigning little weight to Dr. Buchowski's opinions.

### B. RFC Assessment

A claimant's RFC is "the most a claimant can still do despite his or her physical or mental limitations." Martise v. Astrue, 641 F.3d 909, 923 (8th Cir. 2011) (internal quotations, alteration and citations omitted). "The ALJ bears the primary responsibility

---

[18]The ALJ discounted Ms. Smith-Foret's opinion, in part, because she assigned plaintiff an Axis I diagnosis of bipolar disorder, while Dr. Buchowski assigned Major Depressive Disorder. (Tr. 26). Contrary to the ALJ's assertion (see Tr. 26), Ms. Smith-Foret is not alone in diagnosing bipolar disorder because that was Dr. Sky's diagnosis for plaintiff as well. As Dr. Irvin and Dr. Buchowski both noted, however, the evidence of a prior manic episode is somewhat equivocal. (Tr. 238, 264). Thus, there appears to be a genuine dispute among the treating professionals. For the purposes of determining whether plaintiff is disabled, however, the distinction is immaterial, as both disorders can cause the severe limitations observed by Dr. Buchowski and Ms. Smith-Foret.

for determining a claimant's RFC and because RFC is a medical question, some medical evidence must support the determination of the claimant's RFC." Id. (citation omitted). The ALJ should obtain medical evidence that addresses the claimant's "ability to function in the workplace." Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001) (quoting Nevland v. Apfel, 204 F.3d 853, 858 (8th Cir. 2000)). "However, the burden of persuasion to prove disability and demonstrate RFC remains on the claimant." Id. Even though the RFC assessment draws from medical sources for support, it is ultimately an administrative determination reserved to the Commissioner. Cox v. Astrue, 495 F.3d 614, 619 (8th Cir. 2007) (citing 20 C.F.R. §§ 416.927(e)(2), 416.946 (2006)). "Because the social security disability hearing is non-adversarial, however, the ALJ's duty to develop the record exists independent of the claimant's burden in this case." Stormo v. Barnhart, 377 F.3d 801, 806 (8th Cir. 2004).

The ALJ found that plaintiff has the RFC to work if she were limited to simple instructions and nondetailed tasks and was required to handle customer complaints infrequently. (Tr. 22). In reaching this RFC, she gave strong weight to the records of Dr. Sky and Dr. Irvin which "noted significant improvement after brief periods of treatment in 2008, to include the fact that the claimant was facing financial problems as being the cause of her episode of decompensation." (Tr. 26). These records establish only that plaintiff improved enough to be discharged from the hospital and do not support the ALJ's RFC determination. The ALJ also rejected Dr. Buchowski's MSS and thus no medical evidence supports the RFC determination.

## VI. **Conclusion**

For the reasons discussed above, the Court finds that the Commissioner's decision is not supported by substantial evidence in the record as a whole.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is **reversed** and this matter is **remanded** pursuant to the fourth sentence of 42 U.S.C. § 405(g) for further proceedings.

A separate Judgment in accordance with this Memorandum and Order will be entered this same date.

_____
CAROL E. JACKSON
UNITED STATES DISTRICT JUDGE

Dated this 13th day of February, 2015.